UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TERRENCE J. HANCOCK, TIMOTHY P. DUNLAP, JOHN LISNER, DALE BOLT, BRAD WEBB, JAMES BUIK, MICHAEL I. RICHARDSON, and EDWARD DENORMANDIE, as Trustees of the Local No. 731, I.B. of T., Garage Attendants Linen and Laundry Health and Welfare Fund, | ) ) ) ) ) ) ) | 13 C 857<br><br>Judge Feinerman |
| and | ) ) | |
| TERRENCE J. HANCOCK, TIMOTHY P. DUNLAP, JOHN LISNER, MICHAEL I. RICHARDSON, STEVE VOGRIN, and THOMAS J. YONKER, as Trustees of the Local No. 731, I.B. of T., Private Scavengers and Garage Attendants Pension Trust Fund, | ) ) ) ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | |
| vs. | ) ) | |
| ILLINOIS CENTRAL SWEEPING LLC, | ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Illinois Central Sweeping LLC ("ICS") is a street sweeping company that employs

unionized workers. Pursuant to its collective bargaining agreements ("CBA") with the union,

Excavating, Grading, Asphalt, Private Scavengers, Automobile Salesroom Garage Attendants,

and Linen and Laundry Drivers Local Union No. 731, International Brotherhood of Teamsters

("Local 731"), ICS contributed money to a multiemployer pension fund and to a multiemployer

health and welfare fund for the benefit of its employees. Not enough money, say the funds'

trustees, who filed this suit under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking payment for allegedly delinquent contributions

between October 2006 and December 2011, plus interest, liquidated damages, attorney fees, and

various other sums.  Doc. 21.  ICS counterclaimed, seeking recompense for alleged overpayments that it made in the same timeframe.  Doc. 32.  A one-week bench trial has been set for June 2015.  Doc. 80.  Plaintiffs have moved for summary judgment on ICS's counterclaims and for partial summary judgment on their claims.  Doc. 57.  The motion is granted in part and denied in part.

## Background

A preliminary matter is Plaintiffs' contention that ICS's Local Rule 56.1(b)(3)(C) statement of additional facts should be stricken because it "flagrantly violates the requirement that non-movants file a statement of short numbered paragraphs consisting of just one fact" in that "[s]ome of ICS'[s] numbered paragraphs are more than half a page long" and "ICS has used excessively lengthy factual statements to circumvent the 40-statement limitation."  Doc. 65 at 9. In response, ICS correctly observes that most of the paragraphs targeted by Plaintiffs simply quote excerpts from the CBA or include tables listing the employees and weeks for which ICS claims it overpaid Plaintiffs.  Doc. 72.  ICS does concede that two of its paragraphs (Doc. 64 at ¶¶ 17, 22) may be too long.  Those paragraphs are long, but not excessively so, given the dizzying array of overpayments and underpayments at issue here.  And in any event the court need not and will not rely on anything asserted in those two paragraphs to resolve this summary judgment motion.  Accordingly, Plaintiffs' request to strike ICS's Local Rule 56.1(b)(3)(C) statement is denied.

The following facts are set forth as favorably to ICS, the non-movant, as the record and Local Rule 56.1 permit.  *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).  On summary judgment, the court must assume the truth of those facts, but does not vouch for them.  *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Since its founding in 2004, ICS has entered into a series of CBAs with Local 731. Doc. 62 at ¶¶ 3-4; Doc. 64 at ¶ 1. The CBAs required ICS to contribute a weekly amount per employee to a multiemployer pension fund and to a multiemployer health and welfare fund— Local No. 731, I.B. of T., Private Scavengers and Garage Attendants Pension Trust Fund ("Pension Fund"), and Local No. 731, I.B. of T., Garage Attendants Linen and Laundry Health and Welfare Fund ("Welfare Fund"), respectively. Doc. 62 at ¶¶ 3-4. It is undisputed that from 2006 to 2011, ICS failed to make some required contributions to both funds. ICS disputes only the magnitude of its shortfall, and it further alleges in its counterclaims that it should have paid a lower weekly rate to the Welfare Fund than it did and that it deserves credit for mistaken overpayments to the Pension Fund. Here, in a nutshell, are the major issues currently in dispute for purposes of this summary judgment motion:

- Does the CBA obligate ICS to pay weekly contributions to the Pension Fund for *all* active employees, or, as with its Welfare Fund contributions, only for those employees who work two or more days in the week?

- In the event of a delinquent contribution, ICS must pay liquidated damages at a rate of 10%, increasing to 20% "if a lawsuit is filed." ICS remitted some of its delinquent contributions *before* Plaintiffs filed this lawsuit, but it did not pay liquidated damages on those contributions. Because Plaintiffs have now filed suit, is ICS obligated to pay the higher 20% liquidated damages rate on those delinquent contributions?

- Between 2006 and 2011, ICS mistakenly made contributions to the Pension Fund for employees who did not work. Is ICS entitled to restitution for those amounts, or at least a credit against its underpayments in the same timeframe?

- The CBA requires ICS's weekly contribution per employee to the Welfare Fund to "be equal to the contributions made by Waste Management." Does this mean Waste Management's *gross* contribution per employee, or its *net* contribution after subtracting employee copayments?

Article IX of what the parties call the "2004 CBA," which was effective through October 31, 2006, provided in relevant part:

> Section 1.  The EMPLOYER, beginning thirty (30) days after an Employee is
> employed, shall … pay to the LOCAL NO. 731 I.B. OF T. GARAGE ATTENDANTS
> LINEN AND LAUNDRY HEALTH AND WELFARE PLAN (hereinafter called "HEALTH
> AND WELFARE FUND") … the sum of [$117.15] per week for each Employee
> employed by the EMPLOYER.
>
> …
>
> Sec. 3.  The EMPLOYER shall pay to the LOCAL NO. 731 PRIVATE SCAVENGERS
> AND GARAGE ATTENDANTS PENSION FUND (hereinafter called "PENSION FUND")
> … the sum of $75.00 a week for each Employee employed by the EMPLOYER
> during the calendar week starting with the sixtieth (60th) day of employment,
> providing the Employee has been employed for sixty (60) days or more for the
> same EMPLOYER.
>
> …
>
> Sec. 11.  The Employer shall pay to the Garage Attendants, Linen and
> Laundry Welfare Fund the weekly contribution for any week in which a
> Sweeper Chauffeur works two (2) or more days.

Doc. 64 at ¶ 2.  Based on one of its members' previous work experience at Waste Management, also a unionized company, ICS interpreted Section 11 of the 2004 CBA to mean that it was obligated to make the weekly contributions to *both* the Pension Fund *and* the Welfare Fund *only* for employees who worked at least two days in the week—and that is what it did.  *Id.* at ¶¶ 3-4.

In August 2006, the Pension Fund retained an auditor, David Lehner, to check ICS's compliance with its contribution obligations.  *Id.* at ¶¶ 5-6.  ICS provided the auditor with its payroll records from 2004 to 2006, and ICS's General Manager at the time, Cheryl DeVries, told Lehner that ICS had been making weekly contributions to *both* funds *only* for employees who worked at least two days in the week.  *Id.* at ¶ 8.  After completing the audit, Lehner told DeVries "that ICS was in complete compliance with its obligations under the collective bargaining agreement."  *Id.* at ¶ 9.  Lehner's firm then sent a letter to both funds dated August 2, 2006, stating that "[t]here were no exceptions found" in the audit.  *Id.* at ¶ 10; *see* Doc. 64-1 at 44 (the letter).

A successor CBA, effective from November 1, 2006 through October 31, 2011, and called the "2006 CBA," left Article IX materially unchanged except for the dates and weekly contribution amounts. Doc. 62 at ¶ 4; *see* Doc. 58-1 at 8-10 (2006 CBA, Article IX). Section 11 was renumbered Section 10 but was otherwise unchanged. Doc. 64 at ¶¶ 2, 14-15; *see* Doc. 58-1 at 8-10. ICS's Managing Member, Charles DeVries, avers that had Lehner in the 2006 audit challenged ICS's interpretation of the CBA's two-day rule, DeVries "would have sought clarification during negotiations and made sure that the [new] CBA stated what ICS management intended." Doc. 64 at ¶ 13; *see* Doc. 64-1 at 4 (Declaration of Charles DeVries, ¶ 11).

The 2006 CBA provided that ICS's weekly contribution obligation to the Welfare Fund would be $144.15 per employee, increasing to $160.15 in November 2007. Doc. 62 at ¶¶ 6-7. The 2006 CBA further provided that "[e]ffective November 1, 2008 and each November 1 thereafter, this amount shall be equal to the contributions made by Waste Management Sweeping Division to the HEALTH AND WELFARE FUND under its labor agreement with the UNION." *Id.* at ¶ 8; Doc. 58-1 at 8. In October 2008, Waste Management (not a party to this suit) and Local 731 entered into a collective bargaining agreement, which provided that Waste Management could, starting in October 2009, collect from its employees weekly copayments to help offset Waste Management's required contributions to the Welfare Fund. Doc. 62 at ¶¶ 22-23; Doc. 64 at ¶ 35. Taking into account the copayments, Waste Management's weekly contributions to the Welfare Fund on behalf of its employees were as follows:

**Table 1**

| Year | Waste Management's total contribution | Employee copay | Waste Management's net contribution |
|------|------|------|------|
| 2010 | $195.15 | $16 | $179.15 |
| 2011 | $195.15 | $25 | $170.15 |
| 2012 | $203.15 | $34 | $169.15 |
| 2013 | $214.00 | $34 | $180.00 |

Doc. 64 at ¶¶ 33, 36. In November 2009, ICS began withholding identical health insurance copayments from its employees. Doc. 62 at ¶ 25; Doc. 64 at ¶ 35. ICS employees responded by filing grievances, arguing that the CBA did not authorize the withholding of copayments. Doc. 62 at ¶ 26. In January 2013, an arbitrator sustained the grievances, concluding that ICS violated the CBA by deducting the copayments from employee wages. Doc. 62 at ¶¶ 26, 29; Doc. 58-1 at 223-38 (arbitrator's decision). Pursuant to the arbitration award, ICS refunded to its employees all of the withheld copayments. Doc. 64 at ¶ 34.

Meanwhile, between February 2010 and July 2011, ICS on several occasions was tardy in making some required contributions to both funds. Doc. 62 at ¶¶ 31-33, 35, 37-39, 41. The funds' respective trust agreements, which under the CBA are binding on ICS, *id*. at ¶¶ 15-16, provide that in the event of delinquent contributions, "[l]iquidated damages shall be assessed at the rate of 10% prior to the filing of a lawsuit to collect the amounts due and at the rate of 20% if a lawsuit is filed." Doc. 58-1 at 83 (Pension Fund Trust Agreement § 5.04(E)); *id.* at 134 (Welfare Fund Trust Agreement § 5.04(B)); *see also* Doc. 62 at ¶ 19; Doc. 58-1 at 94 (Pension Fund Trust Agreement § 15.01(A)(5)) (requiring "the payment of liquidated damages in the amount of ten percent (10%) of any and all [delinquent] contributions …, or the sum o[f] twenty percent (20%) of such contributions as liquidated damages should there be further delay in payment that necessitates the filing of a lawsuit by the Trustees against the Employer"); *id.* at 142 (Welfare Fund Trust Agreement § 15.01(A)(5)) (same). (ICS's Local Rule 56.1(b)(3)(B) response to Plaintiffs' Local Rule 56.1(a)(3) statement denies Plaintiffs' assertion about the liquidated damages rate, but on the irrelevant ground that the funds' "collection procedures" document was not properly attached to the trust documents. Doc. 62 at ¶ 19. Because the trust agreements themselves provide for liquidated damages, and given the lack of any record citation

in ICS's response, Plaintiffs' assertion is deemed admitted.)  With the exception of interest on some late payments in early 2010, ICS has paid neither interest nor liquidated damages on these tardy contributions.  *Id*. at ¶¶ 36, 39, 40, 42.  ICS did, however, remit the required contribution amounts themselves—that is, it paid off the principal—before Plaintiffs filed this lawsuit.  *Id*. at ¶¶ 31-33, 35, 37-38, 41, 43.

In February 2012, Plaintiffs hired an auditor to check ICS's compliance with its contribution requirements to the Pension Fund between July 2006 and December 2011 and to the Welfare Fund between October 2006 and December 2011.  *Id*. at ¶ 44.  The audit states that the auditor found "substantial contributions that ICS had failed to remit to the Funds for the Audit Period."  *Id*. at ¶ 49.  The auditor sent an initial compliance report to ICS in July 2012.  *Ibid*.  After some back and forth between the parties, Plaintiffs sent a revised compliance report and a demand letter to ICS in December 2012.  *Id*. at ¶¶ 50-53.  ICS refused to pay anything, and Plaintiffs filed this suit in February 2013.  *Id*. at ¶ 54.  Based on information adduced in discovery, Plaintiffs sent updated compliance audit summaries to ICS in May 2013; the summaries state that ICS owes the equivalent of 72 person-weeks' worth of contributions to the Welfare Fund and 207 person-weeks to the Pension Fund.  *Id*. at ¶ 55; *see* Doc. 58-2 at 56, 69 (copies of compliance audit summaries).  The parties call a person-week's worth of contributions a "week," and the court will follow suit.

Plaintiffs have since credited ICS with some cash contributions and 10 weeks of payments (7 to the Pension Fund, 3 to the Welfare Fund).  Doc. 62 at ¶¶ 57-58; *see also* Doc. 58-1 at 67 (Affidavit of Ryan Lacey, ¶ 27).  Of the 200 weeks now sought by the Pension Fund, at least 85 are undisputedly for weeks in which the employee earned less than $400, which the parties agree means that the employee worked for less than two full days that week.  Doc. 64 at

¶ 23. Another 6 (or maybe only 5, as ICS's filings are internally inconsistent) are for weeks in which the employee received only vacation pay. *Id*. at ¶ 21.

ICS asserts that Plaintiffs seek payment for 19 weeks (14 to the Pension Fund, 5 to the Welfare Fund) in which the employee did not work at all; Plaintiffs have not moved for summary judgment on those 19 weeks. Doc. 62 at ¶ 59; *see* Doc. 58-1 at 67-68 (Lacey Affidavit, ¶ 30); Doc. 59 at 1 n.1. ICS further asserts that the Welfare Fund seeks payment for one week for an employee who worked only one day that week; Plaintiffs have not moved for summary judgment on that week either. Doc. 62 at ¶ 59; *see* Doc. 58-1 at 68 (Lacey Affidavit, ¶ 31); Doc. 59 at 1 n.1. The following table summarizes the disputed and undisputed weeks for Plaintiffs' underpayment claim:

**Table 2**

| Number of weeks of underpayment | Welfare Fund | Pension Fund | Citation |
|---|---|---|---|
| Funds' total claim | 69 | 200 | Doc. 58-1 at 67; Doc. 58-2 at 56, 69 |
| Disputed factual issues (summary judgment not sought) | (6) | (14) | Doc. 62 at ¶ 59; Doc. 58-1 at 67-68 |
| Disputed because employee worked less than 2 full days | | (85) | Doc. 64 at ¶ 23 |
| Disputed because employee received only vacation pay | | (6) | Doc. 64 at ¶ 21 |
| **Net undisputed underpayment** | **63** | **95** | |

In addition to the underpayments, the 2012 audit uncovered several instances of overpayments by ICS to the funds. Doc. 62 at ¶ 68. While acknowledging that these overpayments were made in error, and despite having previously credited other employers for those employers' overpayments, Plaintiffs refused to credit ICS for its overpayments. *Id*. at ¶¶ 69-71; Doc. 64 at ¶ 29. From 2007 to 2011, ICS overpaid 57 weeks to the Pension Fund.

Doc. 64 at ¶ 30.  The Pension Fund awards annual pension credits to employees based on how many weeks the employee spends in covered employment that year:

**Table 3**

| Work in covered employment | Pension Credit Earned |
|---|---|
| Less than 22 weeks | None |
| 22 weeks | 0.5 |
| 23-30 weeks | 0.6 |
| 31-34 weeks | 0.7 |
| 35 or more weeks | 1.0 |

*Id*. at ¶¶ 24-26; *see* Doc. 64-1 at 52.  Upon retirement, an employee's total number of pension credits determines his or her monthly pension benefit.  *See Schane v. Int'l Bhd. of Teamsters Union Local No. 710 Pension Fund Pension Plan*, 760 F.3d 585, 586-87 (7th Cir. 2014).  In 2011, ICS paid 39 weeks to the Pension Fund for an employee who had worked only 34 weeks; by virtue of having a 35th week mistakenly credited to him, the employee earned a full pension credit for that year instead of only 0.7 credits.  Doc. 64 at ¶ 30.  This is the only instance in which any of ICS's overpayments to the Pension Fund affected an employee's earned pension credit.  *Ibid*.  ICS has accordingly limited its counterclaim to 56 weeks, not 57 weeks, of overpayments to the Pension Fund.  *Ibid*.  ICS does not seek restitution or credit for any overpayments made to the Welfare Fund.

**Discussion**

Plaintiffs correctly point out that ICS has not disputed its underpayment liability for 158 weeks.  (Plaintiffs actually say 159 weeks, Doc. 65 at 7 & n.2, but that is because they incorrectly assume that ICS identified only 5 weeks in which the employee was on vacation, instead of 6.  Doc. 64 at ¶ 21 (listing 6 weeks).  Because ICS is the non-movant, the court will assume that the correct number is 6.)  Accordingly, the court grants summary judgment to

Plaintiffs on these 158 weeks—63 to the Welfare Fund, 95 to the Pension Fund, as shown in Table 2 of the Background section.  The following addresses the issues that remain in dispute.

## I.    Plaintiffs' Claims

### A.    Pension Fund Contributions for Weeks in which the Employee Worked Less Than Two Full Days

ICS argues that it owes no contributions to the Pension Fund for weeks in which the employee worked less than two full days.  It bases its argument on the CBA's two-week provision (Section 11 of the 2004 CBA, Section 10 of the 2006 CBA), which states:

> The Employer shall pay to the Garage Attendants, Linen and Laundry Welfare Fund the weekly contribution for any week in which a Sweeper Chauffeur works two (2) or more days.

Doc. 64 at ¶ 2.  Plaintiffs contend that because this provision references only the Welfare Fund, it applies the two-day rule only to the Welfare Fund and not to the Pension Fund.

To support its position, ICS notes that the two-day provision names the "Garage Attendants, Linen and Laundry Welfare Fund" instead of the "Garage Attendants Linen and Laundry *Health and* Welfare Fund," and from that premise argues that the provision is ambiguous and accordingly could refer to *both* the Welfare Fund *and* the Pension Fund.  The argument is meritless.  The provision obviously refers only to the Welfare Fund; the word "pension" is nowhere to be found.  Absent a comparable provision in the CBA for the Pension Fund, the two-day rule does not apply to contributions to the Pension Fund.

ICS's more promising argument is estoppel, which alleges that Plaintiffs' 2006 audit giving ICS a clean bill of health lulled it into thinking that the two-day rule applied to both funds, not just the Welfare Fund.  Doc. 32 at 8-9.  In the ERISA context, "[a]n estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation."  *Black v. TIC Inv. Corp.*, 900 F.2d 112,

115 (7th Cir. 1990). In actions for breach, "estoppel support[s] the notion that a party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required and then sue for non-compliance." *Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979). As noted above, ICS assumed that the two-day provision applied to the Pension Fund, and in 2006 the auditor found "no exceptions"—that is, no violations of the 2004 CBA's contribution requirements—even though ICS's General Manager, Cheryl DeVries, explicitly told the auditor, David Lehner, that ICS was applying the two-day rule to its Pension Fund contributions. Having received a clean bill of health, ICS continued to make Pension Fund payments only for weeks in which the employee worked at least two full days. And ICS manager Charles DeVries stated that had Plaintiffs or their auditor questioned the two-day rule's application to the Pension Fund under the 2004 CBA, ICS would have insisted in negotiating the 2006 and successor CBAs that the rule be explicitly applied to the Pension Fund. On the summary judgment record, a reasonable factfinder could conclude that the conduct of Plaintiffs and their auditor in 2006 was misleading and that ICS's detrimental reliance on that conduct in making benefit payments was reasonable, and thereby find for ICS on its estoppel defense. *See Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 588 (7th Cir. 2000); *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1286 (11th Cir. 1990), cited approvingly in *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 650 (7th Cir. 1993); *cf. Martin v. Hamil*, 608 F.2d 725, 730 n.8 (7th Cir. 1979) (considering the defendants' argument that they relied on the advice of the fund's auditor, but finding that the reliance was unreasonable).

Plaintiffs retort that the court should disregard all evidence relating to the 2006 audit. ICS's estoppel defense alleges that "on August 2, 2006, the *Plaintiffs issued a letter to ICS stating that after reviewing the pertinent collective bargaining agreements and the employer*

payroll records, the Plaintiffs determined that ICS owed no additional contributions to the Plaintiff funds." Doc. 32 at 7 (emphasis added). Plaintiffs note that the only August 2, 2006 letter that it produced in discovery was addressed not by Plaintiffs to ICS, but by the auditor to Plaintiffs, and they argue that because ICS did not receive a copy of that letter until "it emerged through discovery in this litigation," ICS could not have relied upon the letter back in 2006. Doc. 65 at 13-14. Plaintiffs also contend that the first time they learned of Cheryl DeVries's conversation with Lehner was from ICS's response brief opposing summary judgment, and so the court's considering that alleged conversation would prejudice them because they have not yet had a chance to depose her. *Id.* at 14.

Plaintiffs' arguments are meritless. No rule requires a defendant to list in its answer all of the evidence it plans to rely on in support of an affirmative defense. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1274, pp. 616-17 (3d ed. 2004) ("[A]n affirmative defense may be pleaded in general terms and will be held to be sufficient … as long as it gives the plaintiff fair notice of the nature of the defense.") (footnote omitted). Rather, "[a]ffirmative defenses are pleadings and, therefore, are subject to all pleading requirements of the Federal Rules of Civil Procedure." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). A complaint meets federal pleading requirements so long as "it contains 'enough fact to raise a reasonable expectation *that discovery will reveal evidence*' to support liability for the wrongdoing alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). ICS's affirmative defenses need not meet a higher standard.

Moreover, it is implausible that ICS lacked a copy of the August 2, 2006 letter before discovery commenced in this lawsuit. Plaintiffs filed suit in February 2013; in its April 2013

answer and affirmative defenses, ICS mentioned an August 2, 2006 letter twice. Doc. 17 at 5-7. What other letter could ICS have possibly been referring to? That the letter is addressed from the auditor to Plaintiffs instead of from Plaintiffs to ICS is immaterial; ICS obviously had a copy of the letter, which it must have received from either Plaintiffs or their auditor. So ICS's allegation that "the Plaintiffs issued [the] letter to ICS" is, while not perfectly accurate, understandable in that the auditor sent the letter to ICS at Plaintiffs' behest—which in the court's experience is what invariably happens when a fund's auditor completes an audit of an employer, and something that Plaintiffs' lawyers ought to know better than most. Anyway, ICS's estoppel defense has always relied on the auditor's issuing a clean bill of health to ICS in 2006, and Plaintiffs cannot seriously claim to have been misled or confused about this point.

As for Lehner's conversation with Cheryl DeVries, ICS answered an interrogatory asking it to "[i]dentify any person who may be called as a witness" with: "In addition to those persons listed in [ICS's] Rule 26(a) disclosure, Cheryl DeVries has knowledge of prior audits of ICS by Plaintiffs." Doc. 72 at 4; *see* Doc. 58-1 at 55 (interrogatory response). And in an answer to two other interrogatories, ICS stated that "Dave Lehner, with knowledge that ICS did not make contributions while employees were on vacation, or who worked less than two days in a week, reported to ICS that it did not owe additional contributions, including contributions in weeks ICS did not make contributions for employees who did not work because of vacation or who worked less than two days in a week." Doc. 72 at 4-5; *see* Doc. 58-1 at 56. Plaintiffs therefore cannot plausibly claim to be surprised by ICS's relying on DeVries as a witness and on Lehner's communication to ICS about the 2006 audit.

As a last gasp, Plaintiffs contend that Lehner—an auditor whom *they* hired for the express purpose of verifying ICS's compliance with its contribution obligations—was not their

agent, and therefore that anything Lehner said or wrote to ICS is not attributable to them. Doc. 65 at 14-15. The argument is exceptionally weak. Of course Lehner was Plaintiffs' agent for any actions he undertook in his capacity as their auditor. *See Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 463 (7th Cir. 1994) ("[ERISA] trustees may delegate authority to an agent to perform certain acts. In addition, an agent may bind his principal through the exercise of apparent authority, which arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf.") (internal quotation marks and citation omitted); *Kittlaus v. United States*, 41 F.3d 327, 330 (7th Cir. 1994) (noting that independent contractors may be agents, citing *Restatement (Second) of Agency*); *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 279, 284 (Ill. 2004) (holding that outside attorneys can be agents and therefore declining to "fashion a wholesale exception to the agency rules for attorneys").

Unremarked by the parties is that although the Seventh Circuit has long recognized estoppel claims brought by employee beneficiaries against single-employer plans, *see*, *e.g.*, *Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 509 (7th Cir. 2011); *Bowerman*, 226 F.3d at 588; *Thomason*, 9 F.3d at 649-50; *Black*, 900 F.2d at 114, it has not yet, as far as the court can tell, explicitly approved its use as an affirmative defense in an action brought by a multiemployer plan against an employer. *See Black*, 900 F.2d at 115 ("We hold, therefore, that estoppel principles are applicable to claims for benefits under unfunded single-employer welfare benefit plans under ERISA. We express no opinion as to the application of estoppel principles in other situations."). But Plaintiffs do not argue that estoppel is categorically unavailable in such actions; they argue merely that it fails for the specific reasons described above. Plaintiffs'

summary judgment motion is therefore denied as to whether the two-day rule applies to ICS's Pension Fund obligations.

### B. Liquidated Damages Rate on the Tardy 2010 and 2011 Contributions

Plaintiffs next ask for summary judgment on their claim for interest and liquidated damages on certain delinquent payments from 2010 and 2011. ICS does not dispute that it owes interest at the contractual rate of 1% per month, compounded monthly, on its delinquent contributions. Doc. 62 at ¶ 18. (As with its irrelevant denial of Plaintiffs' assertion regarding the liquidated damages provision, *id.* at ¶ 19, ICS's denial of Plaintiffs' assertion regarding the interest rate is based solely on the "collection procedures" document's not being properly attached to the trust agreements. It is therefore deemed admitted.) Nor does ICS dispute that it owes liquidated damages on its delinquent contributions. The only question is whether liquidated damages will be assessed at the rate of 10% or 20%. And even that question is undisputed as to the 158 conceded weeks of underpayment and any other weeks of underpayment for which ICS is held liable at trial; those weeks will be subject to the 20% liquidated damages rate. *See* 29 U.S.C. § 1132(g)(2)(C)(ii) (mandating an award of liquidated damages at the contractual rate in successful actions by ERISA trustees to enforce employer contributions to multiemployer plans under a CBA); *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 654 (7th Cir. 2001) ("The interest and liquidated-damages provisions of ERISA apply … to contributions that are unpaid at the date of suit[.]"); Doc. 62 at ¶ 19.

The dispute here is limited to the delinquent contributions from 2010 and 2011 that ICS paid *before* Plaintiffs filed this lawsuit. Doc. 62 at ¶¶ 31-42. Although ICS paid Plaintiffs the delinquent contribution amounts, it paid neither interest nor liquidated damages on those amounts. Both parties agree that, had ICS paid interest and liquidated damages before the

lawsuit was filed, the liquidated damages rate on the delinquent contributions would have been 10%. Having filed the lawsuit, however, Plaintiffs now want the unpaid balance of liquidated damages on those delinquent contributions to be assessed at a 20% rate.

Because ICS paid the delinquent contributions before suit was filed, the parties' contract, as interpreted by federal common law, governs the claim. *See Gustafson*, 258 F.3d at 654-55 (holding that "section 1132(g)(2) is inapplicable" to claims relating to "the late contributions the defendant finally paid before the suit was brought"). Recall the trust agreement's provision regarding liquidated damages: "Liquidated damages shall be assessed at the rate of 10% prior to the filing of a lawsuit to collect the amounts due and at the rate of 20% if a lawsuit is filed." Doc. 58-1 at 83 (Pension Fund Trust Agreement § 5.04(E)); *id.* at 134 (Welfare Fund Trust Agreement § 5.04(B)). Plaintiffs argue that because unpaid interest and liquidated damages are "amounts due" no less than the principal, their filing this lawsuit triggered the higher 20% rate on the delinquent contributions. That is one possible interpretation; but another, equally if not more plausible, is that "amounts due" refers only to the delinquent contributions.

Indeed, the trust agreements elsewhere provide that the purpose of the liquidated damages provision is "to compensate the Trust Fund for the additional administrative costs and burdens imposed by delinquency or untimely payment of contributions," and that the higher 20% rate kicks in "should there be *further* delay in payment that necessitates the filing of a lawsuit." Doc. 58-1 at 94 (Pension Fund Trust Agreement § 15.01(A)(5)) (emphasis added); *id.* at 142 (Welfare Fund Trust Agreement § 15.01(A)(5)) (same). The word "further" rests uneasily with Plaintiffs' theory; ICS's failure to pay interest or penalties (at the 10% rate) on the delinquent contributions before a suit is filed would be an *initial* delay in payment, not a *further* delay. The only payments that are delayed (from their original due date to the audit date), and then further

delayed (from the audit to the lawsuit), are the contributions themselves.  Or so, at least, a reasonable factfinder could conclude in interpreting the ambiguous liquidated damages provision.  Summary judgment as to whether the 20% liquidated damages rate applies to the tardy payments in 2010 and 2011 is therefore denied.  *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783-84, 787 (7th Cir. 2005) (holding that an ambiguous term in an ERISA plan document defeats summary judgment).

On summary judgment, then, Plaintiffs are entitled only to the interest and liquidated damages shown in this table:

|  | Welfare Fund | Pension Fund |
|---|---|---|
| Interest (12/10, 4/11-6/11) (as of 8/4/11) | 387.38 | 312.30 |
| Liquidated Damages (12/10, 4/11-6/11) (**10%**) | 3,801.92 | 2,929.50 |
| Interest (8/10-11/10, 5/11-7/11) (as of 11/9/11) | 847.47 | 775.00 |
| Liquidated Damages (8/10-11/10, 5/11-7/11) (**10%**) | 1,216.85 | 1,144.50 |
| Reinstated Liquidated Damages (2/10-4/10) (**10%**) | 1,815.84 | 868.40 |
| **Balance Due** | **$8,069.46** | **$6,029.70** |

Doc. 62 at ¶ 43; Doc. 58 at ¶ 43.  Whether Plaintiffs can recover additional liquidated damages on the delinquent contributions paid before suit was filed must await trial.

## C.     Auditor Fees

Plaintiffs seek summary judgment on their claim for auditor fees relating to the 2012 audit, which, as noted in Table 2 of the Background section, found 269 weeks' underpayment, 158 weeks of which are undisputed.  ICS does not dispute that audit costs are recoverable under ERISA.  *See* 29 U.S.C. § 1132(g)(2)(E); *Trs. of Chi. Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 902 (7th Cir. 2009); *Moriarty ex rel. Local Union No. 727, I.B.T. Pension Trust, & the Teamsters Local Union No. 727 Health & Welfare Trust v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005).  Rather, ICS argues that auditor fees must be reasonable and necessary and that Plaintiffs have offered no evidence demonstrating that the fees were in fact reasonable. *See Cork Plastering*, 570 F.3d at 903-04.

Plaintiffs unconvincingly contest the legal proposition that audit fees must be reasonable, but the dispute is of no moment because the audit fees they seek are indisputably reasonable. Plaintiffs seek only $8356.18 in audit fees for a not insignificant audit, and ICS does not question that this is the actual amount that Plaintiffs paid the auditing firm for its services. Doc. 62 at ¶ 60. ICS does argue that "[t]he auditor … used the same data to compile reports for both Funds," that he "only entered the same data once," and that he "comp[l]eted hourly time sheets reflecting his time devoted to these audits." Doc. 63 at 24; Doc. 64 at ¶ 37. If anything, these facts *confirm* the reasonableness of Plaintiffs' claim for auditor fees, for they suggest that the auditor was diligent and efficient. "Where an audit was straightforward, the total number of hours devoted to the audit was low, and the court has no reason to believe that certain aspects of the audit were a waste of time, the court may not feel it needs additional detail." *Cork Plastering*, 570 F.3d at 905. That is precisely the situation here, so summary judgment is granted on Plaintiffs' claim for auditor fees.

## III. ICS's Counterclaims

### A. Overpayments to the Pension Fund

As noted above, Plaintiffs' 2012 audit revealed that ICS overpaid 57 weeks to the Pension Fund. ICS seeks a credit or restitution for 56 of those weeks. ERISA *allows* but does not *require* Plaintiffs to refund to ICS the mistaken overpayments. *See* 29 U.S.C. § 1103(c)(2)(A)(ii) ("if such contribution or payment is made by an employer to a multiemployer plan by a mistake of fact or law …, paragraph (1)"—which provides in relevant part that "[e]xcept as provided in paragraph (2) …, the assets of a plan shall never inure to the benefit of any employer"—"shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake"). Nevertheless, the Seventh Circuit has recognized an equitable cause of action by an

employer seeking restitution for mistaken overpayments made to an employee benefit fund. *See Gustafson*, 258 F.3d at 651; *UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 512-13 (7th Cir. 1993). Because nothing in the CBA or the trust agreements specifies what to do in the case of overpayments by ICS, standard equitable principles apply. *See Gustafson*, 258 F.3d at 651; *UIU Severance Pay*, 998 F.2d at 513.

ICS rests its restitution claim on a theory of unjust enrichment. *See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Pathology Labs. of Ark., P.A.*, 71 F.3d 1251, 1254 (7th Cir. 1995) (noting that the "[f]ederal common law [of ERISA] tracks the consensus of states, which have developed the law of restitution," and holding that "restitution is a device to avoid unjust enrichment"). "The fact that a recipient has obtained a benefit without paying for it does not of itself establish that the recipient has been unjustly enriched." *Restatement (Third) of Restitution and Unjust Enrichment* § 2 (2011); *see also Pathology Labs. of Ark.*, 71 F.3d at 1254 (approvingly citing the *Restatement of Restitution* as a guide to developing federal common law under ERISA). Rather, to prevail on its restitution claim, ICS must show that "(1) [it] had a reasonable expectation of payment, (2) the [plaintiffs] should reasonably have expected to pay, *or* (3) society's reasonable expectations of person and property would be defeated by nonpayment." *Harris Trust & Sav. Bank v. Provident Life & Acc. Ins. Co.*, 57 F.3d 608, 615-16 (7th Cir. 1995) (alterations in original, emphasis added) (quoting *Provident Life & Acc. Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990)).

Plaintiffs argue that the Pension Fund could not have been unjustly enriched by ICS's overpayments because the fund "entered those [mistaken] contributions into [its] participant tracking computer database" and "determined [the] participant's pension credits based on the contribution weeks entered into the Database." Doc. 59 at 22-23. This is a *non sequitur*;

19

whether Plaintiffs have been unjustly enriched has nothing to do with its bookkeeping. By Plaintiffs' argument, *every* litigant (not just in ERISA cases) could avoid a finding of unjust enrichment simply by entering ill-gotten gains into a spreadsheet. That cannot possibly be the law. *Cf. Nelson v. Levy Home Entm't, LLC*, 2012 WL 403974, at *13 (N.D. Ill. Feb. 8, 2012) ("Levy's primary argument in support of summary judgment is that Nelson did not comply with Levy's policies regarding expense reports and, in particular, did not provide receipts for all of the expenses she claims she incurred. Nelson's unjust enrichment claim, however, does not require her to prove that she provided Levy with all of the documentation of her expenses that it wanted or that Levy was satisfied that she had spent the money. Rather, Nelson must only provide enough evidence to permit a reasonable fact finder to find 'that valuable services or materials were furnished by the plaintiff, [and] received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying.' Levy cites no authority for its argument that Nelson can demonstrate unjust enrichment only if she complied with Levy's expense report policies.") (citation omitted).

For its part, ICS concedes that if any of the overpayments resulted in an employee's earning extra pension credits, it is not entitled to restitution for those amounts. Hence ICS's claim for only 56, not 57, weeks' restitution, as one week of credit given to one employee yielded extra pension credits for that employee. Doc. 64 at ¶ 30. ICS's concession is in line with Seventh Circuit authority holding that an employee benefit fund is not unjustly enriched if, as a result of overpayments, it extends additional benefits to the employee. *See Gustafson*, 258 F.3d at 651 (denying a restitution counterclaim because the employer's overpayments "were tied to higher pension and welfare benefits for the defendant's employees"); *Constr. Indus. Ret. Fund of Rockford, Ill. v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) ("The welfare fund

pooled the money to provide benefits for all persons on whose behalf contributions were made.
Because the drivers received the health coverage for which they paid through the deductions
Kasper sent to the fund, no one is entitled to restitution.").

The other 56 weeks of mistaken overpayments indisputably did not result in any
employee's earning additional pension credits. Plaintiffs contend, however, that because they
used those overpayments in their *formula* to determine each employee's pension credit, they
could not have been unjustly enriched. Doc. 65 at 19-20; *cf. Cent. States, Se. & Sw. Areas
Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1154-55 (7th Cir. 1989) (en banc)
("Yet pension and welfare plans are insurance vehicles. Insurers *depend* on receiving
contributions from persons who collect far in the future or not at all. … The scheme works only
if the plan receives contributions on behalf of persons who will not get benefits."). Like their
argument about entering the payments into the database, however, this argument proves too
much—for by Plaintiffs' logic no overpayment could ever result in unjust enrichment so long as
the overpayments were considered in a benefits calculation, even if the overpayments resulted in
no additional benefits. Plaintiffs' position cannot be the law, as it would effectively leave
employers "to the mercy of plan trustees who have no financial incentive to return mistaken
payments," undermining the rationale for permitting an equitable cause of action in the first
place. *UIU Severance Pay*, 998 F.2d at 513.

Furthermore, Plaintiffs' rule would essentially ask of employers the impossible: to
calculate their contributions *perfectly*, *every time*. Employers pay a heavy price for
underpayments; for example, ICS owes interest and at least 10% liquidated damages on even
inadvertent underpayments. And in the event of a lawsuit to recover underpayments, ERISA
mandates the payment of additional liquidated damages, fees, and costs. *See* 29 U.S.C.

§ 1132(g)(2). These provisions incentivize employers to err on the side of overpayment rather than underpayment. But if employers had no prospect of recovering mistaken overpayments, they would face a Hobson's choice: err on the side of underpaying and risk having to pay large penalties, or err on the side of overpaying and never recover any overpayments. Faced with this heads-I-win-tails-you-lose dilemma, employers might choose to exit the ERISA game altogether. As the Seventh Circuit explained: "Employers are already penalized for failing to make required contributions. If they are not permitted to seek recovery of mistaken contributions they may be less inclined to sponsor ERISA-qualified plans at all. This would undermine ERISA's goal of expanding pension and welfare benefit plan coverage." *UIU Severance Pay*, 998 F.2d at 513 (citation omitted); *see also Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts*, 954 F.2d 299, 304 (5th Cir. 1992) ("Moreover, if ERISA is going to achieve its objective, it should encourage employers to err toward overpayment rather than to slight the fund because of a fear that there can be no effective restitution. If employers perceive that no refunds are available, they are likely to delay payment to the fund until they can calculate accurately the precise amount they owe. This denies to the fund working capital which could be crucial to its survival. It is true that ERISA is properly construed to benefit employees, but a fundamental fairness to employers is implicit in establishing such funds.").

Incentives aside, none of Plaintiffs' arguments or evidence addresses any of the three disjunctive requisites of unjust enrichment articulated by the Seventh Circuit in *Harris Trust*: whether ICS reasonably expected to be repaid, whether Plaintiffs reasonably should have expected to repay ICS, or whether "society's reasonable expectations of person and property would be defeated by" Plaintiffs' nonpayment. 57 F.3d at 616. By contrast, ICS has adduced evidence that Plaintiffs have made such refunds in the past, Doc. 62 at ¶¶ 70-71; Doc. 64 at ¶ 29,

which—though by no means dispositive, *see Kolbe & Kolbe Health & Welfare Ben. Plan v. Med. Coll. of Wisconsin, Inc.*, 742 F.3d 751, 755 (7th Cir. 2014) ("the motives for making refunds are various, … and the fact that the hospital may on occasion have made refunds in circumstances similar or even identical to this case neither establishes a contractual obligation on the hospital's part to make such refunds, nor could have lulled the Kolbe plan into thinking it" was entitled to one)—is at least probative of the first two grounds for unjust enrichment. Plaintiffs offer nothing in response other than to deny that they routinely refund overpayments to employers. At this stage, however, the court must accept ICS's version of the facts, making summary judgment inappropriate. ICS will of course have the burden at trial of proving that Plaintiffs were unjustly enriched.

In the alternative, Plaintiffs assert the affirmative defense of estoppel, which, as mentioned earlier, "arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." *Black*, 900 F.2d at 115. Plaintiffs argue that ICS's mistaken overpayments were misleading representations; that they relied on the overpayments "by entering them into the Database"; and that the reliance was to their detriment because "the Pension Fund would be harmed if its staff were now forced to spend numerous hours revising the Database." Doc. 65 at 21. The argument is very weak; if "revising the Database" were so expensive and time consuming, why would Plaintiffs have filed this lawsuit to recover underpayments, which would presumably also require "revising the Database"? In any event, restitution is equitable, so if ICS can show that Plaintiffs were unjustly enriched, and if Plaintiffs can show that the cost of revising their database is high, it might be equitable to help defray that cost by reducing ICS's recovery accordingly. But besides improbably claiming that it would take "numerous hours" to revise the database, Plaintiffs have

not even attempted to quantify their costs at the summary judgment stage. They remain free to do so at trial.

**B.      Contribution Rate to the Welfare Fund**

ICS's other counterclaim relates to the contribution rate per employee that it has been paying to the Welfare Fund since 2009. Recall that the 2006 CBA provided that, starting in November 2008, the weekly amount that ICS had to contribute to the Welfare Fund per employee "shall be equal to the contributions made by Waste Management Sweeping Division to the HEALTH AND WELFARE FUND under its labor agreement with the UNION." Doc. 62 at ¶ 8; Doc. 58-1 at 8. The parties' dispute boils down to this: ICS contends that the term "contributions" means Waste Management's *net* contributions (*i.e.*, the amount contributed without counting employee copayments), while Plaintiffs contend that the term refers to Waste Management's *gross* contributions (*i.e.*, the amount contributed including employee copayments). Despite believing now that it had to pay contributions equal only to Waste Management's net contributions, ICS has always paid contributions equal to Waste Management's gross contributions. ICS's counterclaim seeks both retrospective and prospective relief; it wants "an order establishing the proper contribution rate for ICS *and* compelling the Welfare Fund to provide a refund for ICS" for its alleged overpayments. Doc. 63 at 21 (emphasis added).

ICS's and Plaintiffs' interpretations of the above-quoted 2006 CBA provision are both reasonable, which makes it ambiguous and the contractual dispute unsuitable for resolution on summary judgment. *See Bland*, 401 F.3d at 783-84, 787. Indeed, Plaintiffs barely attempt to argue that the clause is unambiguous; they instead assert the defenses of "arbitration and award, res judicata, and collateral estoppel," and they also argue that even if ICS's interpretation is correct, Plaintiffs have not been unjustly enriched and therefore that a refund is unwarranted.

Doc. 59 at 24-26, 27-29.  Plaintiffs' defenses, if successful, would defeat both retrospective and prospective relief; their argument about unjust enrichment, however, can defeat only the restitution claim.

None of Plaintiffs' defenses warrant granting summary judgment.  Plaintiffs invoke the "arbitration and award doctrine," which seems to refer to the settled rule that "a court's examination of an arbitration award itself is extremely limited. … If an arbitrator is even arguably acting within the scope of his authority in interpreting the CBA, his decision will be enforced.  This applies even if the 'court is convinced he committed [a] serious error' of fact or law in reaching his decision." *Monee Nursery & Landscaping Co. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 348 F.3d 671, 675 (7th Cir. 2003) (alteration in original) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam)); *cf. Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (stating that under the Federal Arbitration Act, "[o]nly if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination") (internal quotation and alteration marks omitted).  In other words, the doctrine applies to direct judicial review of an arbitral award, which is not what ICS seeks.

Slightly more promising are Plaintiffs' res judicata and collateral estoppel defenses, both based on an arbitrator's decision regarding employee copayments.  Remember that in November 2009, ICS began withholding health insurance copayments from its employees, just like Waste Management.  Doc. 62 at ¶ 25; Doc. 64 at ¶ 35.  But in January 2013, an arbitrator sustained the resulting employee grievances, concluding that ICS violated the CBA by deducting the copayments from employee wages.  Doc. 62 at ¶¶ 26, 29; *see* Doc. 58-1 at 223-38 (the

arbitrator's decision).  Plaintiffs argue that this decision precludes ICS's raising the same issues in its counterclaim.

The Seventh Circuit has held that "res judicata and collateral estoppel usually attach to arbitration awards," but that "they do so (if they do so) as a matter of contract rather than as a matter of law.  The preclusive effect of the award is as much a creature of the arbitration contract as any other aspect of the legal-dispute machinery established by such a contract."  *IDS Life Ins. Co. v. Royal Alliance Associates, Inc.*, 266 F.3d 645, 651 (7th Cir. 2001) (citations omitted); *see also Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997) (noting that arbitration awards under a CBA may "be pleaded as res judicata in the worker's federal district court suit"); *Restatement (Second) of Judgments* § 84 (1982) ("a valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court").  ICS does not argue that the CBA prevents the application of res judicata and collateral estoppel to a binding arbitration award, and so the court will assume that the doctrines do apply.  Doc. 58-1 at 17 (2006 CBA providing that an arbitrator's decision on a grievance "shall be final and binding on the EMPLOYER").

"Res judicata, or claim preclusion, bars relitigation of a claim that a party raised or could have raised in a prior adjudication."  *Martin v. Garman Const. Co.*, 945 F.2d 1000, 1003 (7th Cir. 1991); *see also Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 700 (7th Cir. 1986) ("Under *res judicata,* 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'") (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  Plaintiffs' sole argument is that ICS's contribution rate counterclaim and the grievance "are based on the same facts: the contract language providing that ICS'[s] contribution rates should be the same as [Waste Management's] rates."  Doc. 59 at

26. But Plaintiffs do not address the key question of whether ICS "could have raised" the issue of its contribution rate in the arbitration proceedings. On that question, ICS asserts that it "did not and could not have raised [in the arbitration] a 'cause of action'" related to its contribution rate counterclaim because "[t]he arbitrator had no authority to provide the relief ICS now seeks: an order establishing the proper contribution rate." Doc. 63 at 21; *see Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 382, (1985) ("claim preclusion generally does not apply where '[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts'") (quoting *Restatement (Second) of Judgments* § 26(1)(c) (1982)). ICS does not support its position with any evidence; then again, neither do Plaintiffs, who are the movants. The court is therefore unable to tell whether the arbitrator could have heard and decided such a claim, or whether it would have been outside of her jurisdictional authority to hear because it would have required adjudicating the rights of Plaintiffs, who, though third-party beneficiaries of the CBA, *see Gerber Truck*, 870 F.2d at 1151, were not parties to the arbitration. Plaintiffs have therefore failed to meet their burden on summary judgment as to their res judicata defense.

Collateral estoppel, also called issue preclusion, "prohibits relitigation of an issue of fact or law when the issue is actually litigated, determined by a final judgment and essential to the judgment of a prior tribunal." *Martin*, 945 F.2d at 1004; *see also Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("Issue preclusion … bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment[.]") (internal quotation marks omitted). Plaintiffs argue that the issue at the heart of ICS's contribution rate counterclaim—whether ICS's "contributions" must equal Waste Management's gross

contributions or net contributions—was actually decided by the arbitrator in these passages from the arbitration decision:

> The contract language requires Illinois Central Sweeping to pay equal contributions to the funds as Waste Management, *and it has done so*. Nothing in the Illinois Central Sweeping Agreement permits co-pays to offset *these contributions*.
>
> …
>
> [T]he Company's decision to begin deducting an amount from each employee's wages as a co-pay in order to offset its contributions to the benefit funds is not supported by the contract language. The deductions constitute a violation of Article IX because they are an unauthorized recoupment—from the employees—of part of the *Employer's contributions mandated by Article IX*. Alternatively, the action violates the wage provisions of the Agreement because, by taking deductions from employee wages not permitted under the Agreement, the Employer has impermissibly reduced employees' wages.

Doc. 58-1 at 236-37 (emphases added).

ICS responds that even if the arbitrator found that ICS's contributions had to equal Waste Management's gross contributions, that finding was not "essential" to her decision. *Taylor*, 553 U.S. at 892. In reply, Plaintiffs concede that the arbitrator's "holding that withholding co-pays violated the wage provisions of the CBA … is stated in the alternative." Doc. 65 at 23. Plaintiffs' concession is fatal to their issue preclusion argument, for alternative holdings are generally not entitled to issue preclusive effect: "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." *Restatement (Second) of Judgments* § 27 cmt. i (1982); *see also Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1008 (7th Cir. 1997) (en banc) ("[H]oldings in the alternative, either of which would independently be sufficient to support a result, are not conclusive in subsequent litigation with respect to either issue standing alone."); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168-70 (5th Cir. 1981); *Halpern v. Schwartz*, 426 F.2d 102, 105 (2d Cir. 1970);

*but see Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 254 (3d Cir. 2006) (forcefully criticizing the rule).

But even if alternative holdings were sometimes entitled to preclusive effect, the arbitrator's contribution rate findings were not essential to her decision. The sole issue before the arbitrator was whether "the Company violate[d] the [CBA] by deducting co-pays from employee wages," Doc. 58-1 at 223, and her award stated only that "[t]he Company violated the [CBA] when it instituted employee co-pays for benefits," *id.* at 238. A determination of ICS's required contribution rate to the Welfare Fund was not essential to that finding, for the arbitrator could have reached her conclusion simply by noting the absence of a copayment provision in the CBA. *Compare* Doc. 58-1 at 8-10 (Article IX of 2006 CBA) *with id.* at 179 (Article IX of Waste Management's contract providing for employee copayments).

So ICS's plea for "an order establishing the proper contribution rate for ICS," Doc. 63 at 21—essentially a request for a declaration—survives Plaintiffs' summary judgment motion. What of ICS's request for restitution? Plaintiffs argue that restitution is unwarranted because "ICS did not properly plead and establish its damages," having failed to refund the employee copayments that it withheld. Doc. 65 at 23-25. But in its Rule 56.1(b)(3)(C) statement, ICS asserts (with sufficient evidentiary support) that it *has* refunded all of the withheld copayments to its employees. Doc. 64 at ¶ 34. Plaintiffs do not deny this assertion, Doc. 66 at 4, which in any event the court must credit at the summary judgment stage.

Plaintiffs also argue that because ICS's contribution rate was not based on a mistake, the Welfare Fund was not unjustly enriched, which precludes restitution under *UIU Severance Pay*, 998 F.2d at 513. Doc. 59 at 28. Plaintiffs say that the rate was not a mistake because "ICS contributed to the Welfare Fund at the correct rate[]" required by the CBA "with the knowledge

that [Waste Management] was contributing at the same rates while offsetting its contribution payments with" employee copayments. *Ibid*. This argument begs the question. ICS's counterclaim is *precisely* that the CBA allows it either to collect offsetting copayments or to reduce its contribution rate correspondingly; after the arbitrator foreclosed the former option, ICS was entitled to the latter. If ICS is correct, then its payments at the higher rate indeed resulted from "a mistake of fact or law." 29 U.S.C. § 1103(c)(2)(A)(ii).

More compelling is Plaintiffs' unjust enrichment argument: Even if ICS is correct that the CBA required it to contribute only the *net* amount that Waste Management contributed, the Welfare Fund was entitled to rely on ICS's consistently paying the *gross* amount throughout the life of the 2006 CBA. *See Russ v. South Water Market, Inc.*, 769 F.3d 556, 557 (7th Cir. 2014) ("[P]erformance under a proposal is one means of giving assent to be bound. ... Murdoch reduced the terms to writing; South Water Market performed for more than a year, paying wages and making contributions at rates higher than those specified in the 2004 agreement."). If, as the Seventh Circuit has held, an employer's "performance under a *proposal* is one means of giving assent to be bound," *ibid*. (emphasis added), then *a fortiori* the same must be true for an employer's performance under a written CBA. Furthermore, as Plaintiffs point out, ICS's winning a refund might have allowed it "to obtain drastically discounted health coverage," Doc. 59 at 29, because it would have paid much less per employee than Waste Management and yet received the same health coverage for its employees. That, Plaintiffs maintain, is hardly equitable. Yet as the Supreme Court has held, even in the ERISA context, unjust enrichment is "'beside the point' when parties demand what they bargained for in a valid agreement," as "[t]he agreement itself becomes the measure of the parties' equities." *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546, 1548 (2013). Then again, the Welfare Fund is not a party to the CBA; it

is a third-party beneficiary—in fact, more like a holder in due course, *see Russ*, 769 F.3d at

558—and so might have been entitled under the CBA's terms to *receive* the same contribution

per employee from Waste Management and from ICS regardless of what fraction of the

contribution costs those employers passed along to their respective employees.  On this view,

ICS and Local 731 can fight all they like about the relative employer-employee contribution

percentages, but in no event should the Welfare Fund be left holding the bag.

There are good arguments on both sides of the question.  Rather than resolve it on

summary judgment as a matter of law, the more prudent course is to take evidence at trial and

decide at that point whether ICS paid too high a contribution rate to the Welfare Fund and, if so,

whether Plaintiffs were unjustly enriched by the overpayments.

### Conclusion

Plaintiffs' motion for summary judgment is granted in part and denied in part.  Summary

judgment is granted as to the 158 weeks' uncontested liability for underpayments (63 to the

Welfare Fund, 95 to the Pension Fund); the unpaid interest and 10% liquidated damages on the

undisputed late payments; and the auditor fees.  Summary judgment is denied as to all of

Plaintiffs' other underpayment claims and both of ICS's counterclaims.

November 10, 2014

_____
United States District Judge